961 F.2d 405
 60 USLW 2682, Fed. Sec. L. Rep. P 96,589
 ARMSTRONG WORLD INDUSTRIES, INC., derivatively by Tessie
WOLFSON and Rodney B. Shields, as well as in their own right
v.
William W. ADAMS; Barbara Hackman Franklin; E. Allen
Deaver; George A. Lorch; William Wallace Abbott; Francis
V. Breeze; William M. Ellinghaus; Mary Joan Glynn; Joseph
L. Jones; James E. Marley; Robert F. Patton; J. Phillip
Samper; Harry K. Wells; James J. Haggerty, Secretary of
State of the Commonwealth of Pennsylvania in his official
capacity; Ernie Preate, Jr., Attorney General of the
Commonwealth of Pennsylvania in his official capacity;
Armstrong World Industries, Inc.
Tessie Wolfson and Rodney B. Shields, individually in their
own right and derivatively on Behalf of Armstrong
World Industries, Inc., Appellants.
 No. 91-1503.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 10, 1991.
Decided April 10, 1992.
 
 Mark C. Rifkin (argued), Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., for appellants.
 Thomas L. Vankirk (argued), Stanley Yorsz, Buchanan Ingersoll Professional Corp., Pittsburgh, Pa., for appellees William W. Adams, Barbara Hackman Franklin, E. Allen Deaver, George A. Lorch, William Wallace Abbott, Francis V. Breeze, William M. Ellinghaus, Mary Joan Glynn, Joseph L. Jones, James E. Marley, Robert F. Patton, J. Phillip Samper, Harry K. Wells, and Armstrong World Industries, Inc.
 Before: SCIRICA, ALITO and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 This case involves a challenge to the constitutionality of the Pennsylvania anti-takeover act of 1990. Plaintiffs, shareholders of Armstrong World Industries, Inc.,[1] brought this action seeking declaratory and injunctive relief on behalf of themselves and Armstrong against the board of directors, state officials charged with implementing the Act, and Armstrong nominally. The district court dismissed plaintiffs' complaint for lack of subject matter jurisdiction. Because we conclude that plaintiffs' claims are not ripe for judicial review, we will affirm.
 
 I.
 
 2
 On April 27, 1990, Act No. 36, 1990 Pa.Laws 129, became law. Considered one of the nation's toughest anti-takeover statutes, the Act enhances the ability of management of Pennsylvania corporations to fend off hostile takeover attempts. See Comment, Beyond the Third Generation: An Analysis of Pennsylvania's Latest Attack on Hostile Takeovers, 29 Duq.L.Rev. 579, 591 n. 73 (1991). Among other things, Act 36 revises directors' fiduciary duties, restricts the voting rights of shareholders who initiate control-share acquisitions, and empowers corporations to disgorge short-swing profits realized by bidders who place corporations "in play."
 
 
 3
 The fiduciary duties provision expands directors' discretion in determining the "best interests of the corporation." Directors may now consider whether the corporation's long-term interests and plans would be "best served by the continued independence of the corporation," as well as "[t]he resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation." 15 Pa.Cons.Stat.Ann. § 1715(a)(2) & (3) (Purdon Supp.1991-92) (originally enacted as Act of Apr. 27, 1990, No. 36, § 1721(e)(2) & (3), 1990 Pa.Laws 129).[2] Moreover, "in considering the ... effects of any action," directors need not "regard any corporate interest or the interests of any particular group affected by such action as a dominant or controlling interest or factor." Id. § 1715(b) (Act 36, § 1721(e)(4)).
 
 
 4
 The fiduciary duties provision also fortifies the presumption that directors' actions are in the "best interests of the corporation." Directors are under no "greater obligation to justify" their actions "relating to an acquisition or potential or proposed acquisition of control of the corporation" than in any other circumstances. Id. § 1715(d) (Act 36, § 1721(g)). Furthermore, actions taken by disinterested directors in the change-of-control context are presumed to be in the "best interests of the corporation," except where it is proven that such actions were not taken "in good faith after reasonable investigation." Id.[3]
 
 
 5
 The control-share acquisitions provision restricts the voting rights of any person who acquires shares in connection with a "control-share acquisition." See id. § 2564(a) (Act 36, § 2563(a)). A control-share acquisition occurs whenever a person acquires voting power for the first time over 20, 33 1/3, or 50% of the voting shares of a corporation. Id. § 2562. Persons who initiate control-share acquisitions are denied voting rights in "control shares," except where such rights are granted by a majority of disinterested shares and a majority of all voting shares. Id. § 2564(a) (Act 36, § 2563(a)). Control shares are "[t]hose shares of a corporation that, upon acquisition of voting power over such shares by an acquiring person, would result in a control-share acquisition." Id. § 2562.
 
 
 6
 The disgorgement provision enables corporations to recover short-swing profits realized by any "controlling person" from the sale of shares in connection with a control-share acquisition. Id. § 2575 (Act 36, § 2574). A controlling person is any person or group that (1) acquires, offers to acquire, or announces its intention to acquire voting power over at least 20% of the shares entitled to vote in an election of directors, or (2) announces that "it may seek to acquire control of a corporation through any means." Id. § 2573. All profits realized within eighteen months after obtaining controlling-person status from the sale of shares acquired two years prior to, or eighteen months subsequent to, attaining such status may be recovered by the corporation through an enforcement action. Id. § 2575 (Act 36, § 2574).
 
 
 7
 Unlike the fiduciary duties provision, which governs all actions taken by directors, the control-share acquisitions and disgorgement provisions only apply in the change-of-control context. Under the Act, corporations may "opt-out" of any or all of the foregoing provisions. See id. §§ 1711(b) (Act 36, § 1721(j)), 2561(b) & 2571(b). Although many corporations subject to Act 36 have elected to opt-out, Armstrong has not and remains subject to the Act's change-of-control and fiduciary duties provisions.[4]
 
 
 8
 On the day Act 36 became law, plaintiffs brought this action in federal district court seeking declaratory and injunctive relief. In their complaint, plaintiffs allege that the Act's control-share acquisitions and disgorgement provisions violate the Supremacy Clause of the United States Constitution, by contravening and frustrating the purposes of the Williams Act[5]; the Commerce Clause, by discriminating against interstate commerce, namely, out-of-state shareholders; the Contracts Clause, by impairing the contractual rights acquired by plaintiffs upon their purchase of Armstrong shares; and the First Amendment, by restricting the free speech rights of plaintiffs and potential tender offerors. In addition, plaintiffs contend that the fiduciary duties provision violates the Contracts Clause, for the same reason as the Act's change-of-control provisions; and the Fifth Amendment, by diminishing the value of their property interest in Armstrong stock.[6]
 
 
 9
 Plaintiffs maintain that they have been harmed as a direct result of the passage of the Act. First, they contend that defendant directors actively lobbied for and expended vast amounts of corporate assets in support of the passage of Act 36. Second, they claim that Armstrong was the subject of an "unsolicited tender offer" initiated by the Belzberg family of Canada in July 1989, which was withdrawn because of Act 36.[7] Third, plaintiffs assert that the passage of Act 36 precipitated the decline in the market value of Armstrong stock, which dropped 18% from the date the Act was introduced (October 20, 1989) to the date it became law (April 27, 1990), and 52% in the year following its enactment.[8] Finally, plaintiffs allege that Act 36 will deter potential tender offerors from placing Armstrong "in play," thus depriving them of their right to sell Armstrong shares to a hostile tender offeror.
 
 
 10
 Defendants filed a motion to dismiss for lack of subject matter jurisdiction. According to defendants, plaintiffs' complaint does not present a "case or controversy" within the meaning of Article III of the Constitution, because the challenged provisions of Act 36 cannot affect plaintiffs until and unless Armstrong becomes the subject of a takeover attempt triggering the Act. Therefore, defendants maintain, plaintiffs' action is not ripe for judicial review.
 
 
 11
 The district court agreed. Applying the test set forth in Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643 (3d Cir.1990), it held that "plaintiffs' claims do not constitute a real and immediate controversy appropriate for judicial resolution," and dismissed plaintiffs' complaint for lack of subject matter jurisdiction. Armstrong World Indus., Inc. v. Adams, No. 90-2920, 1991 WL 83087 (E.D.Pa. May 10, 1991).[9] This appeal followed.
 
 II.
 
 12
 We have jurisdiction under 28 U.S.C. § 1291. At issue is the justiciability of plaintiffs' complaint, and, in particular, whether their claims are ripe for judicial review. Our review of the district court's order dismissing plaintiffs' complaint for lack of subject matter jurisdiction is plenary. Haydo v. Amerikohl Mining, Inc., 830 F.2d 494, 496 (3d Cir.1987).[10]
 
 A.
 
 13
 Article III, section 2 of the United States Constitution limits federal jurisdiction to actual "cases" and "controversies." U.S. Const. art. III, § 2. It was intended to ensure that federal courts decide only those disputes of "a Judiciary nature," M. Farrand, 2 Records of the Federal Convention of 1787, at 430 (1911), and stands as a direct prohibition on the issuance of advisory opinions, Flast v. Cohen, 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968).
 
 
 14
 To satisfy Article III's "case or controversy" requirement, an action must present "(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution." International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 915 (3d Cir.1987); see also City of Los Angeles v. Lyons, 461 U.S. 95, 101-05, 103 S.Ct. 1660, 1665-67, 75 L.Ed.2d 675 (1983). The case or controversy requirement must be met regardless of the type of relief sought, including declaratory relief. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950).
 
 
 15
 In Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), the Supreme Court explained:
 
 
 16
 The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act[11] is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.
 
 
 17
 See Step-Saver Data Sys., Inc. v. Wyse Technology, 912 F.2d at 646-47 (discussing the applicability of the case or controversy requirement in the declaratory judgment context).
 
 
 18
 The case or controversy requirement has engendered numerous justiciability doctrines that further define the limits of federal jurisdiction. Among these is the ripeness doctrine, which determines when a proper party may bring an action.[12] See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985) ("[R]ipeness is peculiarly a question of timing.").[13] "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Lab. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).
 
 
 19
 In determining whether an action is ripe for judicial review, the Supreme Court generally looks to "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. at 1515. In the declaratory judgment context, we have refined this test because of the difficulty in defining ripeness in actions initiated before an "accomplished" injury is established. Step-Saver, 912 F.2d at 647. We focus instead on the "adversity of interest" between the parties, the "conclusivity" that a declaratory judgment would have on the legal relationship between the parties, and the "practical help, or utility," of a declaratory judgment. Id.
 
 
 20
 As we explained in Step-Saver, " '[f]or there to be an actual controversy the defendant must be so situated that the parties have adverse legal interests.' " Id. at 648 (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2757, at 582-83 (2d ed. 1983)). Where the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III. Id.
 
 
 21
 Of course, a plaintiff need not suffer a completed harm to establish adversity of interest between the parties. See Pacific Gas & Elec. Co. v. State Energy Resource Conservation & Dev. Comm'n, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) ("One does not have to await the consummation of threatened injury to obtain preventative relief.") (citation omitted). In some situations, present harms will flow from the threat of future actions. See Nichols, supra, at 171. However, "[t]o protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " Salvation Army v. Department of Community Affairs, 919 F.2d 183, 192 (3d Cir.1990) (quoting Steffel v. Thompson, 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974)); see also Pacific Gas & Elec. Co., 461 U.S. at 201, 103 S.Ct. at 1720 (stating that the threatened injury must be "certainly impending").
 
 
 22
 In addition to having adversity of interest between the parties, "[a]ny contest must be based on a 'real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " Step-Saver, 912 F.2d at 649 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)) (emphasis added). A declaratory judgment granted in the absence of a concrete set of facts would itself be a "contingency," and applying it to actual controversies which subsequently arise would be an "exercise in futility." Id. at 648.
 
 
 23
 Nevertheless, the need for a concrete set of facts is greater in some instances than others. The Supreme Court has said that an "actual factual setting" is "particularly important in cases raising allegations of an unconstitutional taking of private property." Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 294-95, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). On the other hand, it has indicated that a factual record is not as important where the question presented is "predominantly legal," such as one of federal preemption. Pacific Gas & Elec. Co., 461 U.S. at 201, 103 S.Ct. at 1720. Of course, even where the need for a concrete set of facts is not as great, the case or controversy requirement must be met.
 
 
 24
 Finally, because "[o]ne of the primary purposes behind the Declaratory Judgment Act was to enable plaintiffs to preserve the status quo ..., a case should not be considered justiciable unless 'the court is convinced that [by its action] a useful purpose will be served.' " Step-Saver, 912 F.2d at 649 (quoting E. Borchard, Declaratory Judgments 29 (1941)). Therefore, even if a declaratory judgment would clarify the parties' legal rights, it should ordinarily not be granted unless "the parties' plans of actions are likely to be affected by a declaratory judgment." Id.
 
 
 25
 As the Step-Saver court recognized, the foregoing factors are not exhaustive of the principles courts have considered in evaluating ripeness challenges. See id. at 647. For instance, where the constitutionality of a state provision is at issue, the Supreme Court has taken into account the degree to which postponing federal judicial review would have "the advantage of permitting state courts further opportunity to construe [the challenged provisions], and perhaps in the process 'materially alter the question to be decided.' " Renne v. Geary, --- U.S. ----, 111 S.Ct. 2331, 2339, 115 L.Ed.2d 288 (1991); see also Webster v. Reproductive Health Servs., 492 U.S. 490, 506, 109 S.Ct. 3040, 3050, 106 L.Ed.2d 410 (1989) (plurality opinion) (invoking same principle to postpone review of Missouri statute governing the rights of unborn children).[14]
 
 
 26
 In addition, courts have invoked the Ashwander principle, see Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 346-47, 56 S.Ct. 466, 482-83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), which calls for the avoidance of ruling on federal constitutional matters in advance of the necessity of deciding them, to postpone judicial review where it would be premature. See, e.g., Hastings v. Judicial Conference of the United States, 770 F.2d 1093 (D.C.Cir.), cert. denied, 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1985).
 
 B.
 
 27
 With these general principles in mind, we now turn to an analysis of the justiciability of plaintiffs' complaint. As we have noted, plaintiffs raise a number of challenges to the constitutionality of Act 36. In addition, they allege that they have been harmed as a direct result of the passage of the Act. Although we recognize that the line demarcating ripeness is often difficult to draw, our application of the Step-Saver test persuades us that plaintiffs' complaint is not ripe for judicial review.
 
 
 28
 1. Adversity of Interest.
 
 
 29
 The first Step-Saver factor is the adversity of interest between the parties. The district court found the adversity of interest here to be minimal, because plaintiffs' action "depends upon a contingency which may not occur." As it explained, plaintiffs' complaint is contingent upon a takeover attempt triggering Act 36 and defendant directors' exercise of power under the Act to plaintiffs' detriment. We agree.
 
 
 30
 As we have noted, plaintiffs allege that Armstrong was the subject of an "unsolicited tender offer" by the Belzberg family when Act 36 became law. But plaintiffs have not pointed to a single instance in which the control-share acquisitions or disgorgement provisions of Act 36 were triggered to either plaintiffs' or the Belzberg family's detriment in connection with this purported tender offer. Furthermore, the Belzberg family sold nearly all its Armstrong holdings shortly after this action was filed.
 
 
 31
 The Belzberg family's SEC filings are instructive.[15] In July 1989 the Belzberg family filed a Schedule 13D indicating that "it was exploring the possibility and feasibility of making a proposal ... to acquire [Armstrong]."[16] At that time, the Belzberg family reported holding 9.85% of outstanding Armstrong common stock. In March 1990 it reported holding 10.69% of outstanding Armstrong common stock. In May 1990 the Belzberg family sold all but .05% of its Armstrong holdings, then totalling about 11.5% of outstanding Armstrong common stock. The Belzberg family never filed a Schedule 14D-1 disclosing an actual tender offer for Armstrong shares.[17]
 
 
 32
 Although Armstrong may have been a "takeover target," no formal tender offer was ever initiated by the Belzberg family.[18] Nor did the Belzberg family's attempt to gain control of Armstrong trigger the Act's change-of-control provisions: its Armstrong holdings never exceeded the control-share acquisitions provision's 20% ownership threshold, see 15 Pa.Cons.Stat.Ann. § 2562; and, even assuming the Belzberg family was a "controlling person" under the Act, the disgorgement provision was never invoked, see id. § 2573. Finally, plaintiffs have not alleged that the Belzberg family took or failed to take any action subjecting it to enforcement or the threat of enforcement under the Act.
 
 
 33
 Our research has failed to locate a single case in which a federal court has reviewed the constitutionality of anti-takeover legislation under similar circumstances. Instead, federal courts have uniformly required that a tender offer be commenced for a corporation subject to the statute, see, e.g., Grand Metropolitan PLC v. Pillsbury Co., 704 F.Supp. 538 (D.Del.1988); Nomad Acquisition Corp. v. Damon Corp., 701 F.Supp. 10 (D.Mass.1988); SWT Acquisition Corp. v. TW Servs., Inc., 700 F.Supp. 1323 (D.Del.1988); or that the tender offeror have taken or failed to take actions subjecting it to enforcement or the threat of enforcement under the challenged statute, see, e.g., Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); Mesa Petroleum Co. v. Cities Serv. Co., 715 F.2d 1425 (10th Cir.1983).
 
 
 34
 SWT Acquisition Corp. v. TW Services, Inc. is illustrative. In that case the district court dismissed a challenge to the constitutionality of 8 Del.C. § 203 of the Delaware business combination statute on the ground that the plaintiff (SWT) "has not yet commenced the all shares tender offer it suggests § 203 unconstitutionally deters." 700 F.Supp. at 1329. According to the court, prior to the commencement of a tender offer, "SWT faces only abstract and hypothetical injury from § 203." Id.
 
 The court explained:
 
 35
 Nothing in § 203 prevents SWT from commencing an all shares tender offer conditioned upon a finding that § 203(a)(3) is unconstitutional as applied to SWT. SWT has not taken this step; rather, SWT asks this Court to hypothesize as to what might happen if SWT commenced an all shares offer for [the target corporation's] outstanding voting stock. At bottom, SWT seeks an advisory opinion as to the constitutionality of § 203 as it relates to an all shares tender offer not yet made. This runs counter to Article III jurisprudence. A case or controversy does not yet exist.
 
 
 36
 Id. at 1329-30 (emphasis in original).
 
 
 37
 Significantly, SWT (1) had informed the SEC that it would commence an all shares tender offer if § 203 were found unconstitutional, (2) had adequate financing commitments to commence an all shares tender offer, and (3) had crossed the 15% ownership threshold necessary to trigger the Delaware business combination statute. Although the court noted that these factors "increased the ripeness of the dispute," it nevertheless found SWT's challenge nonjusticiable. See id. at 1330 n. 16. Cf. Black & Decker Corp. v. American Standard, Inc., 679 F.Supp. 1183 (D.Del.1988).[19]
 
 
 38
 Plaintiffs argue that the reported cases, including SWT Acquisition Corp., are inapposite because the plaintiffs in those cases were potential tender offerors rather than shareholders of potential target corporations.[20] This distinction is important, because plaintiff shareholders allege they have been harmed as a direct result of the passage of Act 36 in a manner which a hostile tender offeror could not be. However, as we discuss below, we are not persuaded that the factors cited by plaintiffs make this case ripe for judicial review.
 
 
 39
 More important, we believe the need for an actual tender offer is equally pressing here, where plaintiffs are shareholders of a potential target corporation. Until there is a takeover attempt offer which would trigger Act 36, we believe the likelihood that the control-share acquisitions and disgorgement provisions will be applied to plaintiffs' detriment is too remote to give rise to Article III jurisdiction. As the Supreme Court long ago observed, "[d]etermination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." International Longshoremen's & Warehousemen's Union, Local 37 v. Boyd, 347 U.S. 222, 223-24, 74 S.Ct. 447, 448, 98 L.Ed. 650 (1954).
 
 
 40
 Of course, it is not always necessary to await the consummation of a threatened injury. See Pacific Gas & Elec. Co. v. State Energy Resource Conservation & Dev. Comm'n, 461 U.S. at 201, 103 S.Ct. at 1720. Accordingly, we do not suggest that to establish subject matter jurisdiction, plaintiffs would have to wait until a tender offeror has actually been stripped of its voting rights over control shares or disgorged of its short-swing profits from the sale of such shares under the Act. Rather, we believe plaintiffs' challenge to the Act's change-of-control provisions is contingent upon the existence of a takeover attempt which would trigger Act 36. As we have explained, this has yet to occur here.
 
 
 41
 Plaintiffs also distinguish this case on the ground that Act 36's fiduciary duties provision applies regardless whether the change-of-control provisions have been triggered, and thus presently affects directors' actions, whereas the anti-takeover legislation challenged in the reported cases only applied in the change-of-control context. According to plaintiffs, therefore, even if their challenge to the control-share acquisitions and disgorgement provisions of Act 36 is contingent, their challenge to the "completely separate" fiduciary duties provision is ripe for judicial review. We disagree.
 
 
 42
 Plaintiffs analogize this case to Bowsher v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). In that case the Supreme Court struck down § 251 of the Gramm-Rudman-Hollings Act, which assigned to the Comptroller General certain executive functions in the deficit reduction process. Id. at 732-33, 106 S.Ct. at 3191. Because the Comptroller General is removable by Congress, and is therefore accountable to the Legislative Branch, the Act "violate[d] the command of the Constitution that the Congress play no direct role in the execution of the laws." Id. at 730-31, 736, 106 S.Ct. at 3190, 3193.
 
 
 43
 The Court rejected the defendants' argument that § 251 was not ripe for judicial review until the Comptroller General was actually removed. Quoting the three-judge district court, the Court stated: "[I]t is the Comptroller General's presumed desire to avoid removal by pleasing Congress, which creates the here-and-now subservience to another branch that raises separation-of-powers problems." Id. at 727 n. 5, 106 S.Ct. at 3188 n. 5. Like the removal provision for the Comptroller General in Bowsher, plaintiffs argue that Act 36's fiduciary duties provision creates "an ongoing and continuing impact" on directors' actions, thus placing the parties in an "adversarial posture."
 
 
 44
 We believe Bowsher is inapposite. The issue presented in that case was not the constitutionality of the removal provision for the Comptroller General, but whether Congress could vest executive powers in an officer of the Legislative Branch. Because § 251 vested executive powers in an officer subject to congressional removal, the separation-of-powers violation occurred upon the enactment of the statute. There was no need to postpone judicial review until the Comptroller General was removed.
 
 
 45
 By contrast, plaintiffs' challenge to the fiduciary duties provision here is premature. Unlike § 251, which directed the Comptroller General to exercise executive functions in the deficit reduction process, the fiduciary duties provision does not direct defendant directors to act in any particular way. Rather, it merely sets the standards for permissible director action if they choose to act. At present we may only surmise how defendant directors will act under the expanded fiduciary duties provision. Therefore, until defendants have acted in a manner implicating the fiduciary duties provision to plaintiffs' detriment, we believe plaintiffs' challenge to that provision is also contingent.
 
 
 46
 Furthermore, plaintiffs' challenge to the fiduciary duties provision is partially dependent on the existence of a takeover attempt, because significant aspects of that provision are only applicable in the change-of-control context. As we have noted, in considering the "best interests of the corporation," § 1715(a)(3) authorizes directors to take into account "[t]he resources, intent and conduct (past, stated and potential) of any person seeking to acquire control of the corporation." 15 Pa.Cons.Stat.Ann. § 1715(a)(3). Likewise, under § 1715(d) actions taken by disinterested directors in the change-of-control context are presumed to be in the "best interests of the corporation," except where it is proven that such actions were not taken "in good faith after reasonable investigation." Id. § 1715(d).
 
 
 47
 Notwithstanding the contingent nature of their claims, plaintiffs argue that their complaint is ripe for judicial review because they have been harmed as a direct result of the passage of Act 36.[21] As we have noted, plaintiffs allege that defendant directors actively lobbied for and expended corporate funds in support of the passage of Act 36, and that the passage of Act 36 caused the Belzberg family to withdraw its so-called tender offer, precipitated the decline in the market value of Armstrong stock, and will deter potential tender offerors from ever placing Armstrong "in play." According to plaintiffs, these factors create a case or controversy here. We disagree.
 
 
 48
 The fact that defendant directors supported the passage of Act 36 in the Pennsylvania General Assembly does not make plaintiffs' complaint justiciable. Plaintiffs' challenge here is to the constitutionality of Act 36, not defendants' lobbying efforts in support of the Act. There is nothing preventing plaintiffs from challenging defendants' actions as a breach of fiduciary duty, but this is not that action.
 
 
 49
 Likewise, the withdrawal of the Belzberg family's so-called tender offer does not make plaintiffs' complaint ripe for judicial review. As we have noted, the Belzberg family never initiated a formal tender offer for Armstrong shares, and, in any event, the control-share acquisitions and disgorgement provisions of Act 36 were not triggered by their actions. Consequently, plaintiffs cannot point to a single action taken by defendants pursuant to the Act, including its fiduciary duties provision, which caused the Belzberg family to sell its Armstrong holdings in May 1990.[22] Therefore, under the facts here, the Belzberg family's decision to sell its Armstrong holdings does not make plaintiffs' complaint justiciable.[23]
 
 
 50
 Nor does the decline in the market value of Armstrong stock give rise to Article III jurisdiction here. As we have noted, plaintiffs allege that the "drastic decline" in the market value of Armstrong stock entitles them to judicial review. For support they cite a study linking the decline in the market value of stock in Pennsylvania corporations to the passage of Act 36. See supra note 8. However, neither plaintiffs' allegations nor the study they rely on convinces us that the decline in the market value of Armstrong stock makes plaintiffs' complaint ripe for judicial review.
 
 
 51
 Even assuming the passage of Act 36 contributed to the decline in the market value of Armstrong stock,[24] this would not make plaintiffs' complaint justiciable. It is true that diminution in shareholder investment may constitute an injury to the corporation and its shareholders, see In re Sunrise Sec. Litig., 916 F.2d 874, 886 (3d Cir.1990) ("Underlying the rule that diminution in share value is an injury to the corporation and shareholders generally is the principle that decreases in share value reflect decreases in the value of the corporation."), and, at least in the case of a properly maintained derivative action, a corporation may have standing to sue for the impairment of corporate assets resulting from a violation of federal securities laws, see Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 732 (3d Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971).[25] But we have never suggested that diminution in share value alone is sufficient to make a shareholder challengederivative or not--to a legislative enactment ripe for judicial review.
 
 
 52
 One could argue that every rule of corporate law, not to mention tort or environmental law, affects shareholder investment. See Amanda Acquisition Corp. v. Universal Food Corp., 877 F.2d 496, 506 (7th Cir.), cert. denied, 493 U.S. 955, 110 S.Ct. 367, 107 L.Ed.2d 353 (1989). But plaintiffs have not cited any authority for the proposition that this phenomenon establishes federal jurisdiction before the challenged rule of law has been invoked. Moreover, the Supreme Court has explicitly recognized the states' prerogative to define shareholder rights, see CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 91, 107 S.Ct. 1637, 1651, 95 L.Ed.2d 67 (1987) ("It is thus an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares."), which may affect shareholder investment. Therefore, we see no parallel to those cases where a diminution in shareholder wealth has conferred upon plaintiff shareholders standing to maintain a derivative action alleging a violation of federal securities laws or breach of fiduciary duty.
 
 
 53
 Finally, there remains plaintiffs' contention that the deterrent effect of Act 36 on potential tender offerors renders their complaint justiciable. Because this argument is more difficult to unravel than the others advanced by plaintiffs, we examine it in greater detail.
 
 
 54
 According to plaintiffs, the control-share acquisitions and disgorgement provisions of the Act have "obliterated" their right to sell Armstrong stock at lucrative prices by deterring potential tender offerors from ever placing tender offers "in play." Moreover, because of Act 36's alleged deterrent effect, plaintiffs contend that "it is unlikely that any shareholders will in the future ever be able to present a challenge to the transfer of control provisions that is any more 'ripe' than the present challenge." We disagree.
 
 
 55
 In the first place, we cannot accept plaintiffs' unsupported assertion that the Act has interfered with their right to receive a hostile tender offer for their shares. At least under federal law, it would seem that "[i]nvestors have no right to receive tender offers." Amanda Acquisition Corp., 877 F.2d at 504; see also Johnson & Millon, Misreading the Williams Act, 87 Mich.L.Rev. 1862 (1989). Moreover, as defendants observe, it is not clear that the Act will have the deterrent effect portended by plaintiffs.[26] But even assuming Act 36 will have a deterrent effect on potential tender offerors and this harm is cognizable, we are not persuaded that this makes plaintiffs' complaint ripe for judicial review.
 
 
 56
 Plaintiffs analogize this case to Bowsher v. Synar and Volvo North America Corp. v. Men's International Professional Tennis Council, 857 F.2d 55 (2d Cir.1988). According to plaintiffs, because the Bowsher Court held that the effect of the removal provision on the Comptroller General made the plaintiff's challenge to § 251 ripe for judicial review, 478 U.S. at 727 n. 5, 106 S.Ct. at 3188 n. 5, it follows that the alleged deterrent effect of Act 36 on potential tender offerors makes plaintiffs' complaint justiciable. However, as we have explained, Bowsher is inapposite here.
 
 
 57
 In Bowsher it was not necessary to wait until the removal provision was actually invoked, because the separation-of-powers violation occurred when Congress entrusted a legislative officer with executive powers. Id. at 736, 106 S.Ct. at 3193. The subservient effect of the removal provision led to the Court's determination that the Comptroller General was an officer of the Legislative Branch. By contrast, as we have discussed, plaintiffs' challenge here is contingent. The mere enactment of Act 36 does not give rise to the type of separation-of-powers conflict which created a live controversy in Bowsher.
 
 
 58
 Volvo North America Corp. is also distinguishable. In that case the court of appeals rejected a ripeness challenge to a rule proposed by the defendant men's tennis council because of its anticipated anti-competitive effect. 857 F.2d at 64. The proposed rule threatened to prohibit persons associated with sanctioned tennis events from producing "special events." Id. at 61. The plaintiffs alleged that the specter of the proposed rule's enactment deterred them from entering into certain long-term contracts.
 
 
 59
 The court found the plaintiffs' challenge to this proposed rule justiciable. According to the court, the "allegations plausibly suggest how the proposed rule may have 'a real impact on present affairs'; and under these circumstances, to withhold consideration until the rule is actually developed might work a considerable hardship on [the plaintiffs]." Id. at 64. Furthermore, because the proposed rule was relatively "straightforward," judicial review of it was unlikely to benefit from "further factual development." Id.
 
 
 60
 Significantly, the Volvo North America Corp. court found nonjusticiable the plaintiffs' challenge to other proposed rules. These proposed rules gave the defendant the authority to sanction any event that was not in "the best interests of the sport," prohibited plaintiffs from inviting players to their events as "wild cards," and made the defendant the exclusive agent for the sale of pooled television rights to sanctioned events. Id. at 61. According to the court, because the "alleged present effects" of these proposed rules were more "attenuated," it was "much more difficult to predict how [the defendant would] choose to employ th[ese] rules should they be enacted." Id. at 64-65. Therefore, the court believed that judicial review of these proposed rules might benefit from further factual development. Id. at 65.
 
 
 61
 Unlike the deterrent effect of the proposed "special events" rule found ripe in Volvo North America Corp., which operated against the plaintiffs in that case, the alleged deterrent effect of Act 36 operates against third parties--potential tender offerors. At most, therefore, Volvo North America Corp. would seem to support the proposition that potential tender offerors could challenge the constitutionality of Act 36.[27] See also Office of Communications of the United Church v. FCC, 826 F.2d 101, 109-10 (D.C.Cir.1987) (dismissing argument that deterrent effect of FCC policy statement on potential bidders for communications licenses made plaintiff's challenge ripe for judicial review on the ground that "this is not a hardship shared by any party to this case"). In any event, because Act 36 does not prohibit hostile takeovers of Pennsylvania corporations but merely regulates them, we believe its present effect on potential tender offerors is too attenuated to give rise to a case or controversy here.
 
 
 62
 We believe Brown v. Ferro Corp., 763 F.2d 798 (6th Cir.), cert. denied, 474 U.S. 947, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985), and Nomad Acquisition Corp. v. Damon Corp., 701 F.Supp. 10, are closer to this case. In Brown the court of appeals analyzed the justiciability of a shareholder derivative action challenging the board of directors' adoption of a severance agreement program. In response to a "perceived" takeover attempt, the board of directors created "golden parachutes" for themselves so that in the event the takeover succeeded they would able to "bail out" with favorable benefits.
 
 
 63
 Shortly thereafter, the plaintiff challenged the board's actions on the ground that
 
 
 64
 the severance agreement program served no valid business purpose or interest of [the corporation] or its stockholders, and was designed solely to serve the pecuniary interest of the directors involved, to preserve the directors' control over [the corporation], and to discourage potential acquirers from obtaining a controlling interest in [the corporation].
 
 
 65
 763 F.2d at 800. The court dismissed the plaintiff's complaint on the ground that it was not ripe for judicial review.
 
 
 66
 According to the court, "[the corporation] has sustained no damages since any payments are contingent upon a change of control and a change of control is not presently foreseeable." Id. at 803. "[T]he only damages that plaintiff has shown is [sic] the unavailability of the escrowed funds for unrestricted corporate use and the possible deterrent effect of the existence of the 'golden parachute' agreements on future take-over attempts." Id. at 802. The court found these damages to be "nominal at best." Id.
 
 
 67
 Likewise, in Nomad Acquisition Corp., the district court rejected the plaintiff's argument that the threat that the target corporation would seek protection under the Massachusetts anti-takeover act made its challenge to the constitutionality of that statute ripe for judicial review. According to the plaintiff, an all shares tender offeror, the "uncertainty" regarding the applicability of the challenged legislation " 'chill[ed]' its tender offer, making shareholders less willing to tender their stock." 701 F.Supp. at 12.
 
 
 68
 The court rejected this argument, because it was unable to "conclude that the Act alone or even in large measure has put the 'nip in the air' surrounding the takeover attempt." Id. Moreover, to the extent the threat that the target corporation would opt into the statute created "some risk" for the plaintiff, the court held that "this 'threat' currently represents a mere contingency based upon one of several options that [the target corporation] might take, not upon a 'realistic danger' sufficient to meet the requirements of ripeness." Id. at 13.[28]
 
 
 69
 Accordingly, we do not believe the alleged deterrent effect of Act 36 makes plaintiffs' complaint ripe for judicial review. The Act does not prohibit hostile takeovers, but merely regulates them. Although we assume the Act will have some deterrent effect on takeover activity, this effect will operate against potential tender offerors who are not parties to this litigation. Finally, we disagree with plaintiffs that there will never be a "riper" challenge to Act 36 than the one presented here; plaintiffs' complaint would ripen upon the fulfillment of the contingencies discussed above.
 
 
 70
 In sum, because plaintiffs' challenge to the constitutionality of Act 36 is contingent, the adversity of interest between the parties here is minimal. Operation of the change-of-control provisions is contingent upon a takeover attempt which would trigger the Act, and application of the fiduciary duties provision is dependent upon defendant directors acting in a manner implicating that provision to plaintiffs' detriment. The harm plaintiffs allege they have suffered as a direct result of the passage of Act 36 does not make up for the contingent nature of their action. None of the factors cited by plaintiffs makes their complaint ripe for judicial review.[29]
 
 
 71
 2. Conclusivity.
 
 
 72
 We next examine the conclusivity that a declaratory judgment would have on the legal relationship between the parties. Because "much of the power granted to a corporate board of directors by the challenged statute would apply only if certain events and conditions arise, which may never happen," the district court determined that the second Step-Saver factor also weighed in favor of finding plaintiffs' complaint nonjusticiable.
 
 
 73
 According to plaintiffs, the district court's reasoning is based on a "faulty premise," because the harm suffered by plaintiffs had already occurred and was continuing. Yet, as we have noted, the harm plaintiffs allege they have suffered because of the enactment of Act 36 does not make their complaint justiciable. Plaintiffs also contend that because their complaint presents a facial challenge to the constitutionality of Act 36, it is not necessary to postpone judicial review until it can be applied to a particular set of circumstances. Although we agree that it is not clear judicial review of Act 36 would benefit from further factual development, we are not persuaded that this makes up for the absence of a live controversy here.
 
 
 74
 As we have discussed, where the question presented is "predominantly legal," such as one of federal preemption, the need for factual development is not as great. See Pacific Gas & Elec. Co. v. Energy Resources Conservation & Dev. Comm'n, 461 U.S. at 201, 103 S.Ct. at 1720; Employers Ass'n of New Jersey v. New Jersey, 601 F.Supp. 232 (D.N.J.), aff'd, 774 F.2d 1151 (3d Cir.1985) (table). But plaintiffs raising predominantly legal claims must still meet the minimum requirements for Article III jurisdiction. See Office of Communications of the United Church v. FCC, 826 F.2d at 105. ("[T]he presence of 'a purely legal question' is not enough, of itself, to render a case ripe for judicial review, not even as to that issue."). Otherwise, plaintiffs could circumvent the case or controversy requirement by artfully pleading their constitutional claims.
 
 
 75
 Plaintiffs rely on Atlanta Gas Light Co. v. U.S. Department of Energy, 666 F.2d 1359 (11th Cir.), cert. denied, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982). That case involved a Commerce Clause challenge to the constitutionality of federal legislation prohibiting the distribution of natural gas to residential users for outdoor lighting. At the time the action was filed, the statute had not been enforced against plaintiff natural gas distributors. Moreover, it was unclear how, and indeed whether, any of the states planned to enforce the legislation.
 
 
 76
 Nevertheless, the court of appeals "hesitantly" found the plaintiffs' challenge ripe for judicial review. Id. at 1363 n. 7. According to the court, the plaintiffs' Commerce Clause claim "is unlikely to change in substance or in clarity by virtue of an actual prosecution." Id. at 1364 n. 7. The court also noted that the plaintiffs "are now, and will in the future be the most appropriate parties to raise the Commerce Clause objection." Id. The plaintiffs were "the entities against whom fines will be levied for noncompliance, if and when the Act is enforced." Id.
 
 
 77
 Although we agree with the rationale of Atlanta Gas Light Co., we believe it is inapplicable here. The statute in that case had an immediate effect on the plaintiffs; it prohibited them from distributing natural gas to residential users and subjected violators to the threat of civil fines. By contrast, Act 36 has no such present impact on plaintiffs here. That is, it does not direct them to act or not act, or prevent or hinder them from acting in any particular manner to their detriment. Likewise, the Act does not subject plaintiffs to the threat of civil enforcement if they continue their activities. In short, unlike the plaintiffs in Atlanta Gas Light Co., plaintiffs here have not demonstrated that the hardship of postponing judicial review would be particularly great. See Abbott Lab. v. Gardner, 387 U.S. at 149, 87 S.Ct. at 1516.[30]
 
 
 78
 Ultimately, we are not persuaded that the facial nature of plaintiffs' predominantly legal claims makes up for the contingent nature of their complaint. As we have noted, plaintiffs' complaint is partially contingent on the existence of a takeover attempt which would trigger Act 36. SWT Acquisition Corp. v. TW Services, Inc., 700 F.Supp. 1323, is instructive. As we have discussed, that case involved a challenge to the constitutionality of the Delaware anti-takeover statute. Among other things, the plaintiff argued that the statute was preempted by the Williams Act. The action was dismissed for lack of ripeness, because the plaintiff had not yet made the tender offer it alleged the statute unconstitutionally deterred. Id. at 1330. See also Illinois ex rel. Barra v. Archer Midland Co., 704 F.2d 935, 942 (7th Cir.1983) (dismissing Supremacy Clause challenge to Illinois Strikebreakers Act for lack of subject matter jurisdiction because of contingent nature of plaintiff's complaint).
 
 
 79
 Finally, plaintiffs maintain that a declaratory judgment would be conclusive, because it would establish that plaintiffs have been deprived of their "property rights" under Act 36. But, as we have discussed, although the need for a concrete set of facts is not as great where the issue is predominantly legal, the opposite is true in the takings context. See Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. at 294-95, 101 S.Ct. at 2370. This is the case here.
 
 
 80
 Plaintiffs' Fifth Amendment challenge to Act 36 is predicated on the fiduciary duties provision. According to plaintiffs, this provision "constitutes a fundamental change in the ownership interests of plaintiffs." However, because plaintiffs have not pointed to any instance where defendants have acted under this provision to plaintiffs' detriment, there is no means of assessing the "change in the ownership interests" effected. As the Supreme Court noted in MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 348, 106 S.Ct. 2561, 2565, 91 L.Ed.2d 285 (1986), "[a] court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes."
 
 
 81
 In sum, by its nature a declaratory judgment will almost always have some conclusive effect. But the conclusivity that a ruling on the constitutionality of Act 36 would have at this time does not make up for the lack of a live controversy here. Plaintiffs raising predominantly legal claims must still meet the minimum requirements for Article III jurisdiction. Because of the contingent nature of plaintiffs' complaint, we are not persuaded that these requirements have been satisfied here. Therefore, although a declaratory judgment here would be conclusive in some respects, we do not believe this alone makes plaintiffs' complaint justiciable.
 
 
 82
 3. Utility.
 
 
 83
 The final Step-Saver factor is the "practical help, or utility," of a declaratory judgment. The district court found that "the practical usefulness of a declaratory judgment in this case, in terms of any tangible benefit likely to accrue to plaintiffs if they prevail, is conjectural at best." According to the court, "there is no assurance that striking [the challenged portions of Act 36] will have any beneficial effect upon the value of the plaintiffs' investment in Armstrong."
 
 
 84
 Plaintiffs argue that the district court "inappropriately confined" its utility analysis to the effect of a declaratory judgment on the market value of Armstrong stock. They point to language in Step-Saver, where we said that the "relevant inquiry" in determining the utility of declaratory judgment is "whether the parties' plans of actions are likely to be affected by a declaratory judgment." 912 F.2d at 649 n. 9. According to plaintiffs, "[h]ere the parties' plans for action clearly would be affected if a declaratory judgment were to be issued."
 
 
 85
 We agree that the district court's utility inquiry was too narrow. But we do not believe the effect of a declaratory judgment upon the parties' plans of action would be sufficient to make plaintiffs' complaint justiciable, even taking into account the factors cited by plaintiffs. Declaratory relief with respect to the control-share acquisitions and disgorgement provisions could have no impact on any takeover attempt because none presently exists or is "certainly impending." See Pacific Gas & Elec. Co., 461 U.S. at 201, 103 S.Ct. at 1720. Of course, a declaratory judgment finding these provisions unconstitutional would eliminate the alleged deterrent effect of Act 36. However, as we have noted, the Act does not prohibit tender offers for Pennsylvania corporations.
 
 
 86
 Furthermore, the proper focus of the utility inquiry is the effect of a declaratory judgment on the parties' plans of action--not third parties' plans of action. In the absence of a pending takeover attempt, a declaratory judgment would have no significant effect on either plaintiffs' or defendants' course of conduct. At most such relief would affect the plans of potential tender offerors interested in acquiring Pennsylvania corporations subject to the Act who are not plaintiffs in this action.
 
 
 87
 The utility of a declaratory judgment on the fiduciary duties provision would be no greater. According to plaintiffs, if this provision were declared unconstitutional, "the directors' obligations and duties to the shareholders would be greatly different and the directors would alter their actions accordingly." As we have noted, however, plaintiffs have not pointed to any instance in which defendants have exercised their new fiduciary duties to their detriment. Therefore, we fail to see how a declaratory judgment with respect to this provision could affect defendant directors' actions.
 
 
 88
 Finally, we note that plaintiffs do not face the threat of sanction for noncompliance with Act 36. If anything, plaintiffs' complaint is based on what they believe will not happen as a result of the Act; namely, that potential tender offerors will be deterred from placing Armstrong "in play." This case is therefore unlike the ripeness cases in which individuals faced a "Hobson's choice" of foregoing lawful behavior or subjecting themselves to prosecution under the challenged provision. See, e.g., Abbott Lab. v. Gardner, 387 U.S. 136, 87 S.Ct. at 1507; Wilmac Corp. v. Bowen, 811 F.2d 809 (3d Cir.1987). Moreover, as we have noted, postponing judicial review will not cause plaintiffs to endure substantial economic hardship. See supra note 30.
 
 
 89
 In sum, the utility of a declaratory judgment at this time would not be great. Declaratory relief concerning the change-of-control provisions would have little effect on the parties' conduct in the absence of a takeover attempt triggering Act 36. Likewise, we doubt that a ruling on the constitutionality of the fiduciary duties provision would affect the parties' plans of action, because plaintiffs have been unable to point to any instance in which defendant directors have acted in a manner implicating that provision to plaintiffs' detriment. Finally, plaintiffs do not face the threat of prosecution for noncompliance with Act 36, and postponing judicial review of Act 36 will not impose a great economic hardship on them.
 
 
 90
 4. Other Considerations.
 
 
 91
 As we have noted, where the constitutionality of a state enactment is at issue, the Supreme Court has taken into account the degree to which postponing federal judicial review would have "the advantage of permitting state courts further opportunity to construe [the provision], and perhaps in the process 'materially alter the question to be decided.' " Renne v. Geary, 111 S.Ct. at 2339.
 
 
 92
 Defendants argue that we should invoke this principle here on the ground that "it is unclear how the Act will be interpreted until a specific dispute arises and courts are given an opportunity to construe the new statute." We agree that it is not entirely clear how the challenged provisions of the Act will operate once triggered. However, we are not convinced that an intervening state court interpretation would "materially alter the question to be decided." Therefore, we would not postpone judicial review of Act 36 under the principle stated in Renne.
 
 
 93
 Finally, because of the contingent nature of plaintiffs' complaint, defendants contend that we should postpone judicial review under the principle of avoiding unnecessary constitutional rulings. See Ashwander v. Tennessee Valley Auth., 297 U.S. at 346, 56 S.Ct. at 482 (Brandeis, J., concurring). However, because we believe plaintiffs' complaint is not ripe for judicial review for other reasons, we find it unnecessary to address the applicability of the Ashwander principle here.
 
 C.
 
 94
 Our application of the Step-Saver analysis convinces us that, under the facts here, judicial review of the constitutionality of Act 36 would be premature. Because of the contingent nature of plaintiffs' complaint, the adversity of interest between the parties is minimal. Plaintiffs' challenge to Act 36's change-of-control provisions is contingent upon a takeover attempt which would trigger the Act, and their challenge to the Act's fiduciary duties provision is dependent upon defendant directors acting in a manner implicating that provision to plaintiffs' detriment. Likewise, the utility of a declaratory judgment would not be great. At present a declaratory judgment would have little effect upon the parties' plans of action, and postponing judicial review of Act 36 will not impose a great economic hardship on plaintiffs. Finally, although a ruling on the constitutionality of Act 36 would have some conclusive effect, this does not make up for the lack of a live controversy here. Therefore, we hold that plaintiffs' complaint is not ripe for judicial review.
 
 III.
 
 95
 For the foregoing reasons, we will affirm the district court's order dismissing plaintiffs' complaint for lack of subject matter jurisdiction.
 
 
 96
 Costs taxed against appellants.
 
 
 
 [1]
 Armstrong is a publicly held Pennsylvania corporation with approximately 10,000 shareholders and 44.6 million shares outstanding
 
 
 [2]
 Portions of Act 36 were repealed on December 19, 1990 by Act No. 198, 1990 Pa.Laws 834. However, pertinent provisions of the Act remain codified at scattered sections of the Pennsylvania Business Corporations Law. The citations here are to the most recent version of the Pennsylvania Consolidated Statutes Annotated. Where they differ, the corresponding sections of Act 36 are noted parenthetically
 
 
 [3]
 The Act also contains a more generic "fiduciary duty and indemnification" provision, which is substantively the same as § 1721. See 15 Pa.Cons.Stat.Ann. §§ 511-18
 
 
 [4]
 One survey determined that as of August 1990 about 25% of the corporations subject to Act 36 had opted out. 42 States Currently Have Anti-Takeover Laws, ABA Group Told, 22 Sec.Reg. & L.Rep. (BNA) 1216, 1216-17 (Aug. 17, 1990)
 
 
 [5]
 Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f) (1988)
 
 
 [6]
 Plaintiffs' Contracts Clause and Fifth Amendment claims were brought individually; however, their Supremacy Clause, Commerce Clause, and First Amendment claims were brought both individually and derivatively on behalf of Armstrong
 
 
 [7]
 Defendants maintain that no formal tender offer was initiated by the Belzberg family. According to defendants, in the spring of 1990 the Belzberg family waged a proxy contest for four seats on Armstrong's thirteen-member board of directors. After obtaining only one seat at Armstrong's annual meeting in April 1990, however, the Belzberg family sold nearly all its Armstrong holdings, about 4,750,000 shares of Armstrong's outstanding common stock, less than one month later
 
 
 [8]
 Plaintiffs cite a study linking the recent decline in the market value of stock held in Pennsylvania corporations, including Armstrong, to the passage of Act 36. This study was conducted by two finance professors at Drexel University. It compared the market value of stock held in Pennsylvania corporations during the six months prior to the enactment of Act 36 with "a random sample of other stocks," and found that the market value of Pennsylvania stocks declined by a greater percentage (9%) than the other stocks (3%). See Demick, Study Links Loss by Pa. Stocks to the Takeover Law, Phila. Inquirer, Oct. 14, 1990, at D1
 
 
 [9]
 The district court alternatively held that, even if plaintiffs' complaint were justiciable, it "would decline to become involved in a matter so deeply and traditionally within the province of state law." See Step-Saver, 912 F.2d at 646-647 ("Even when declaratory actions are ripe, the [Declaratory Judgment] Act only gives the power to make a declaration regarding 'the rights and other legal relations of any interested party seeking such declaration,' 28 U.S.C. § 2201; it does not require that the court exercise that power.") (emphasis in original). However, because we hold that plaintiffs' claims are not ripe for judicial review, we do not consider whether the district court properly declined to decide the constitutionality of Act 36 under 28 U.S.C. § 2201
 
 
 [10]
 In reviewing a motion to dismiss for lack of subject matter jurisdiction, the district court must accept as true the allegations contained in the plaintiff's complaint, except to the extent federal jurisdiction is dependent on certain facts. Haydo, 830 F.2d at 496 (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891-92 (3d Cir.1977)). In determining whether subject matter jurisdiction exists, the district court is not limited to the face of the pleadings. Land v. Dollar, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947). Rather, as long as the parties are given an opportunity to contest the existence of federal jurisdiction, see Mortensen, 549 F.2d at 892 n. 18, the district court "may inquire, by affidavits or otherwise, into the facts as they exist." Land, 330 U.S. at 735 n. 4, 67 S.Ct. at 1011 n. 4 See generally 5A C. Wright & A. Miller, Federal Practice and Procedure § 1350 (1990)
 
 
 [11]
 Section 2201 of the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1988), provides:
 In the case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.
 (emphasis added).
 
 
 [12]
 There is some disagreement among courts and commentators as to whether the ripeness doctrine is grounded in the case or controversy requirement or is better characterized as a prudential limitation on federal jurisdiction. See Nichols, Ripeness and the Constitution, 54 U.Chi.L.Rev. 153, 183 (1987) (recognizing that the ripeness doctrine is constitutionally grounded, but arguing that the "wiser course ... is to return the ripeness doctrine to its prudential status"). The Supreme Court itself has not been consistent in this respect, and has referred to ripeness as both a constitutional and prudential doctrine on different occasions. Compare Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 579-82, 105 S.Ct. 3325, 3332-33, 87 L.Ed.2d 409 (1985) (constitutional doctrine) with Buckley v. Valeo, 424 U.S. 1, 117-18, 96 S.Ct. 612, 681-82, 46 L.Ed.2d 659 (1976) (per curiam) (prudential doctrine). But regardless whether the ripeness doctrine has a prudential component, it seems clear that it is at least partially grounded in the case or controversy requirement
 
 
 [13]
 The ripeness doctrine is often confused with the standing doctrine. Whereas ripeness is concerned with when an action may be brought, standing focuses on who may bring a ripe action. E. Chemerinsky, Federal Jurisdiction § 2.4, at 99 & n. 1 (1989). Although these doctrines are analytically distinct, both have evolved from Article III's case or controversy requirement
 
 
 [14]
 This principle stems from the abstention doctrine set forth in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under Pullman a federal court may abstain only if the state law at issue is "fairly subject to an interpretation which will render unnecessary" a ruling on a federal constitutional issue. Harman v. Forssenius, 380 U.S. 528, 534-35, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965); accord Harrison v. NAACP, 360 U.S. 167, 176-77, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959)
 
 
 [15]
 The issue whether Act 36 was triggered by the Belzberg family's actions was clearly before the district court, and a reference to the Belzberg family's Schedule 13D was made during oral argument on defendants' motion to dismiss. This issue was also addressed in the parties' appellate briefs. Moreover, the Belzberg family's efforts to gain control of Armstrong have been before this court before. See First City Diversified Inc. v. Armstrong World Indus., Inc., 902 F.2d 1559 (3d Cir.1990) (Appeal from order instructing Armstrong to make available shareholder list to Belzberg family, but enjoining Belzberg family from using list to communicate to Armstrong shareholders proposed amendments to articles of incorporation). Accordingly, we take judicial notice of the contents of the Belzberg family's Schedule 13D and amendments thereto, as well as the fact that the Belzberg family never filed a Schedule 14D-1 in connection with Armstrong
 
 
 [16]
 Section 13(d) of the Williams Act, 15 U.S.C. § 78m(d) (1988), and Regulation 13D-G require any person who acquires "beneficial ownership" of more than five percent of any class of registered equity security to file a Schedule 13D with the SEC, the issuer, and any exchange on which the security is traded within ten days after the acquisition of such securities. See M. Lipton & E.H. Steinberger, Takeovers & Freezeouts § 2.01[a] (1991). Among other things, this schedule must state "if the purpose or prospective purchases is to acquire control of the business of the issuer of the securities." 15 U.S.C. § 78m(d)(1)(C)
 
 
 [17]
 Section 14(d) of the Williams Act, 15 U.S.C. § 78n(d) (1988), and Regulation 14D prohibit any person from making a tender offer for a class of securities if, after consummation of such tender offer, that person would acquire "beneficial ownership" of more than five percent of such class unless that person files a Schedule 14D-1 with the SEC as soon as practicable after the "commencement" of the tender offer. See Takeovers & Freezeouts, supra, at § 2.04
 
 
 [18]
 We recognize that the "dividing line" between pre-offer acquisitions subject to § 13(d) of the Williams Act and tender offers subject to § 14(d) is hardly clear-cut. But under the conventional definition of a tender offer--"a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price"--it is undisputable that there was no tender offer here. See Takeovers & Freezeouts, supra, at § 2.02 (quoting Note, The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1251 (1973))
 
 
 [19]
 In Black & Decker Corp., relied on by plaintiffs here, the district court found ripe a challenge to the constitutionality of § 203 of the Delaware business combination statute. In that case, however, the plaintiff had commenced a tender offer for the defendant corporation conditioned on its ability to opt-out of the Delaware statute upon acquiring majority ownership. Because § 203 was "presently in effect" and plaintiff had to "go through the procedures of opting out of the statute" to avoid its application, the court found the plaintiff's challenge justiciable. 679 F.Supp. at 1189-90. The SWT Acquisition Corp. court found Black & Decker Corp. "easily distinguishable" on the ground that a "tender offer[ ] had been commenced which could [have been] adversely and directly affected by § 203 prior to the filing of [the] complaint[ ] challenging the constitutionality of § 203." 700 F.Supp. at 1329. Likewise, we believe Black & Decker Corp. is inapposite here
 
 
 [20]
 We recognize that Armstrong may also be characterized as a potential tender offeror. But plaintiffs' challenge here is premised on the harm they allege they will suffer as shareholders of a corporation that is no longer as attractive a takeover target
 
 
 [21]
 Plaintiffs maintain that the district court failed to take into account that with respect to their derivative claims, see supra note 6, it is the harm to Armstrong which determines whether there is a case or controversy here, not that suffered by plaintiff shareholders. We agree. But plaintiffs have not persuaded us that our analysis of the harm allegedly suffered by Armstrong should be different than that of the harm allegedly suffered by its shareholders. Accordingly, except where indicated otherwise, the following analysis is applicable to both plaintiff shareholders and Armstrong
 
 
 [22]
 Defendants maintain that the Belzberg family sold their Armstrong holdings because they failed to gain influence on Armstrong's board of directors at the annual meeting held shortly after Act 36 became law. At this stage, however, we accept plaintiffs' allegations as true
 
 
 [23]
 If the Belzberg family had initiated a formal tender offer, the withdrawal of this tender offer would have given rise to mootness--not ripeness--problems here. See Edgar v. MITE Corp., 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269; Mesa Petroleum Co. v. Cities Serv. Corp., 715 F.2d 1425. But because no formal tender offer was initiated and Act 36 was not otherwise triggered, we need not address mootness
 
 
 [24]
 Defendants contend that the decline in the market value of Armstrong stock cannot be traced to the passage of Act 36. They maintain that "[s]tock prices at any point in time are the result of speculation as to many matters--e.g., change in tax laws, general financial conditions, international and domestic policies, and the interpretation of existing law and possible changes in that law." In addition, they observe that it is possible the Belzberg family's efforts to acquire Armstrong, which began months before Act 36 was passed, inflated the market value of Armstrong stock, and the Belzberg family's decision to sell its Armstrong holdings led to the decline in the market value of Armstrong stock. At this stage, however, we accept plaintiffs' allegation as true
 
 
 [25]
 In Kauffman this court stated:
 A shareholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury to the shareholder is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue.
 434 F.2d at 732. As we have noted, plaintiffs' Supremacy Clause, Commerce Clause, and First Amendment claims were brought both individually and derivatively. See supra note 6. But even assuming their derivative claims were properly maintained, we do not believe the decline in the market value of Armstrong stock makes these claims ripe for judicial review for the reasons we express above.
 
 
 [26]
 Defendants contend that there is no evidence that Act 36 will have the in terrorem effect alleged by plaintiffs. Indeed, the control-share acquisitions provision here is similar to that challenged in CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 107 S.Ct. 1637. Among other things, the plaintiff tender offeror in that case alleged that the statute would unconstitutionally deter tender offers. The Supreme Court found that there was "little evidence" that the statute would reduce the number of successful tender offers. Id. at 93, 107 S.Ct. at 1651
 The Court went on to note that even if such effect did occur,
 this result would not substantially affect our Commerce Clause analysis. We reiterate that this Act does not prohibit an entity--resident or nonresident--from offering to purchase, or from purchasing, shares in Indiana corporations, or from attempting thereby to gain control.
 481 U.S. at 93, 107 S.Ct. at 1651. Nor does Act 36 prohibit hostile takeovers of Pennsylvania corporations. Although the Court's dictum went to the merits of the plaintiff's Commerce Clause claim, it is instructive here.
 
 
 [27]
 Of course, as we have noted, even where tender offerors have challenged the constitutionality of anti-takeover legislation, courts have required that a tender offer be commenced and the target corporation be subject to the challenged statute
 
 
 [28]
 We recognize that Nomad Acquisition Corp. is distinguishable from this case in that an all shares tender offer had been commenced and the defendant corporation had yet to opt for protection under the challenged anti-takeover statute. However, the case is instructive because the deterrent effect of the prospect that the target corporation would opt into the Act did not make the plaintiff's challenge ripe for judicial review. See 701 F.Supp. at 13
 
 
 [29]
 By concluding that the harm plaintiffs allege they have suffered because of the passage of Act 36 does not make their complaint ripe for judicial review, we do not suggest that plaintiffs would not have standing to challenge the constitutionality of Act 36 under the proper circumstances. As the Supreme Court noted in Renne v. Geary, 111 S.Ct. at 2338, "[j]usticiability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." See also Nichols, supra, at 175 ("Ripeness occasionally requires more of admittedly injured plaintiffs."). Here, it is the timing of plaintiffs' action which makes their complaint nonjusticiable, not plaintiffs' standing to raise these claims
 
 
 [30]
 The Supreme Court has indicated that the imposition of economic hardship may be sufficient, in certain instances, to make a facial challenge to a statute or regulation ripe for judicial review. See, e.g., Pacific Gas & Electric Co., 461 U.S. 190, 103 S.Ct. at 1713; Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). But the economic hardship allegedly suffered by plaintiffs here does not compare with that suffered by the plaintiffs in cases where Article III jurisdiction has been found to exist
 In Pacific Gas & Electric Co. the Court found ripe a Supremacy Clause challenge to a California statute imposing a moratorium on the certification of new nuclear facilities until there "exists demonstrated technology or means for the disposal of high-level nuclear waste." 461 U.S. at 198, 103 S.Ct. at 1719. Rather than force the plaintiff utilities to risk their capital and build the nuclear power plants to obtain a ruling on the constitutionality of the moratorium, the Court allowed the plaintiffs' action to proceed. According to the Court, "[t]o require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California." Id. at 201-02, 103 S.Ct. at 1721.
 At the same time, however, the Court held that provisions of the statute governing interim waste storage and informational requirements were not ripe for judicial review. The hardship imposed on the plaintiff utilities by these provisions was not sufficient to give rise to a case or controversy. The interim storage provision operated on a facility-by-facility basis, and its application was contingent on a state energy commission finding that a facility's storage capacity was inadequate. Id. at 203, 103 S.Ct. at 1721. Similarly, "[i]t [was] unreasonable to presume that the[ ] informational requirements [would] exert the same chilling effect on new construction as would a moratorium." Id. at 202 n. 15, 103 S.Ct. at 1721 n. 15.
 In Lake Carriers' Ass'n the Court found ripe a Commerce Clause and Supremacy Clause challenge to a Michigan law requiring the installation of sewage storage devices. Because the statute created an obligation to install sewage storage devices under threat of enforcement, a "live controversy" existed even though no state enforcement action had been taken and the federal regulations that the statute was alleged to conflict with were not yet effective. 406 U.S. at 506-08, 92 S.Ct. at 1755-56.
 By contrast, as we have noted, Act 36 does not prohibit hostile takeover attempts of Pennsylvania corporations, but merely regulates them. Moreover, the Act does not obligate plaintiffs to take any specific action. Nor does it subject them to the threat of enforcement for failing to act. Therefore, the hardship of postponing judicial review here does not compare with that in Pacific Gas & Electric Co. and Lake Carriers' Ass'n.