

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-29-1995

# Travelers Ins. Co. v. Obusek

Precedential or Non-Precedential:

Docket 94-3666

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Travelers Ins. Co. v. Obusek" (1995). *1995 Decisions.* Paper 328.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/328

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-3666


TRAVELERS INSURANCE COMPANY

Appellant

v.

LISA ANN OBUSEK


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


(Civil No. 88-1913)


Argued June 12, 1995
Before: STAPLETON, McKEE, Circuit Judges,
and SEITZ, Senior Circuit Judge

(Opinion filed:  December 29, l995)


A. Richard Feldman, Esquire (Argued)
Jennifer L. Hoagland, Esquire
BAZELON & LESS
1515 Market Street, 7th Floor
Philadelphia, PA 19102-1907

Cheryl Esposito, Esquire
MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
USX Tower, 600 Grant Street
Pittsburgh, PA 15264

Attorneys for Appellant

Edward G. Shoemaker, Esquire (ARGUED)
408 Grant Building


1

Pittsburgh, PA 15219

Attorney for Appellee


OPINION OF THE COURT



McKEE, Circuit Judge

We are asked to decide if attendant care services are an "allowable expense" under Section 103 of the Pennsylvania No-Fault Motor Vehicle Insurance Act, 40 Pa. Con. Stats. Ann. §1009.103 (repealed) ("No-Fault Act") when provided by accredited, non-family, medical care providers.[0] We must also decide if, under the circumstances of this case, this question is ripe for adjudication.

For the reasons that follow, we answer both inquiries in the affirmative. While we thus agree with the district court's disposition of the two primary issues before it, we also conclude that the district court's judgment fails to clearly adjudicate the issues that the parties are entitled to have resolved. We will therefore reverse the district court's judgment and will

---

[0] The No-Fault Act, 40 Pa. Con. Stats. Ann. § 1009.101 et seq., was repealed on October 1, 1984, by the Motor Vehicle Financial Responsibility Law, 75 Pa. Con. Stats. Ann. § 1701 et seq. However, the terms of the No-Fault Act control the obligations of insurers of victims of serious accidents which occurred while the Act was in effect and who still suffer from injuries received in those accidents. Drake v. Pennsylvania National Mutual Casualty Ins. Co., 601 A.2d 797, 798 (Pa. 1992).

2

remand for further findings of fact and the entry of an unambiguous judgment.

## I. FACTUAL BACKGROUND

On October 19, 1979, at the age of 18, Lisa Ann Obusek suffered a severe spinal cord injury while riding as a passenger in an uninsured motor vehicle.[0] Lisa's spinal cord was severed at approximately the C5-C6 level causing her irreversible neurological injury. She was initially treated at Mercy Hospital and later transferred to St. Francis General Hospital in Pittsburgh, Pennsylvania, where she underwent a rehabilitation program. She was eventually discharged from St. Francis, and has been living at home with her parents ever since.

Lisa can move her head and neck but has no use of her legs and only limited movement of her arms. She has no grip in her hands but is able to feed herself when equipped with a cuff and splint. She has no control over her bowels or bladder and urinates through a catheter. Her disabilities are potentially life-threatening if not properly managed. Lisa's speech and intellectual capacities were not affected by the accident.

## A. Required Care

In a medical report dated September 21, 1989, James McCague, M.D., set forth the extent of Lisa's physical limitations, and noted that those limitations impaired her respiratory functions thereby making her susceptible to choking. The report concluded that this, along with her susceptibility to life threatening

---

[0]In order to avoid confusion between Lisa Ann Obusek and her mother, we will refer to Lisa Ann as "Lisa".

infection from bed sores, meant that she needed frequent monitoring and inspection.

In July of 1988, Erie Independence House, ("EIH")[0] performed a Health Care Evaluation of Lisa to determine what products, services and accommodations she needed to achieve maximum feasible physical, psychological, social and vocational rehabilitation. The resulting Report was based upon a five day evaluation at EIH, a review of Lisa's medical records, and an on-site evaluation of her home. The EIH Evaluation made specific recommendations as to those things EIH felt essential for Lisa's rehabilitation and care, including functional equipment, housing modification and adaptations, psychological counseling, physical therapy and attendant care services. The services and accommodations EIH recommended included a regimen of specific exercises and hygiene. It also recommended that "Miss Obusek should . . .receive Attendant Care for all activities of daily living." EIH Evaluation at 7. EIH defined attendant care services as including, but not limited to, "bowel routines; bladder routines; bathing; dressing; weight shifts; transfers; hygiene care; range of motion; house cleaning; exercise routines; leisure time activities; and wheelchair maintenance, etc." Id. EIH recommended that the attendant care services be provided on a twenty-four hour a day basis. Id. EIH also recommended that Lisa:

> 1. [r]eceive 68.67 hours weekly . . . of direct personal care assistance, with the understanding that more hours may be necessary if she should become ill.
>
> 2. [r]eceive 21.64 hours of ancillary assistance weekly, to maintain her living environment.
>
> 3. [h]ave an attendant available to her for the remaining 77.69 hours weekly, after personal care and ancillary services are completed. These hours are necessary to avoid problems, and give assistance throughout the week should problems, based on her physical disability occur.

Id. at 6.

---

[0]Erie Independence House is a facility which offers attendant care and support services to physically disabled, mentally alert people.

EIH defines an attendant or personal assistant as a person "who facilitates physical or social independency (sic) by doing chores required by the disabled person." Id. at Attachment #10, p. 100, *quoting* GEORGE NELSON WRIGHT, PH.D., TOTAL REHABILITATION at 74 (1st Ed. 1980). An attendant "is a paid employee who provides regular, in-home personal care. . . . An attendant is often the most important person in the life of a disabled individual. Attendant care. . . reduces the necessity of institutionalizing disabled persons." Id. at 101, *quoting* TOTAL REHABILITATION at 746- 747.[0]

Staff members of EIH testified that the daily attendant care of quadriplegics can be, and usually is, provided by unskilled lay persons. The only requirements for the job are a high school diploma, a driver's license and having attained the age of 18. In 1989, EIH paid attendant care providers at the rate of $5.00 per hour.

Gilbert Brenes, M.D., Director of the Spinal Cord Injury Program at Harmarville Rehabilitation Center in Pittsburgh, and the rehabilitation expert hired by Travelers, examined Lisa and concluded that she did not require the services of a registered or licensed practical nurse to provide the attendant care she needs. He did, however, conclude that Lisa needed 16 hours a day of attendant care. Additionally, he recommended that a licensed

[0]See also Pennsylvania Attendant Care Services Act, 65 Pa. Con. Stats. Ann. § 305 *et seq.* ("Attendant care services [are]. . .those basic and ancillary services which enable an eligible individual to live in his home and community rather than in an institution and to carry out functions of daily living, self-care and mobility. . . .")

5

practical nurse "be available to change the Foley catheter, to supervise the attendant care so that is done effectively or at any time that [Lisa] runs into respiratory, skin, autonomic or GU complications.' Joint Appendix at 473a.

Lisa's mother, Anna Rose Obusek, is a high school graduate who worked as a part-time bookkeeper before Lisa's accident. She is not a registered nurse or a licensed practical nurse and she does not have a license or certification in either medical or rehabilitative care. However, hospital staff advised Mrs. Obusek on Lisa's care in the months immediately following Lisa's accident, and Mrs. Obusek has provided the attendant care and services Lisa has needed to survive since then. This care includes preparation of meals; setting-up of eating utensils; cleaning-up after meals, assisting with drinking and taking medication; transferring Lisa between bed and wheelchair; dressing and undressing; assisting with Lisa's personal hygiene and grooming; changing, emptying and cleaning the urine bags; bowel stimulation; range-of-motion exercises; changing and sterilizing the Foley catheter; cleaning the bedroom; assisting in the use of exercise equipment; turning Lisa in bed at night; doing laundry; and providing maintenance of wheelchairs.

## B. Procedural History

Neither Lisa, nor the driver of the car she was riding in had automobile insurance at the time of the accident. Therefore, Lisa filed an application for no-fault benefits with Pennsylvania's Assigned Claims Plan. The Assigned Claims Plan is

6

an entity created pursuant to section 108 of the No-Fault Act, 40 Pa.C.S.A. § 1009.108, (repealed), to provide basic no-fault loss benefits to victims of motor vehicle accidents who have no other source of basic loss benefit coverage. The Plan initially assigned Lisa's claim to Allstate Insurance Company for evaluation and processing.  Lisa requested coverage for all "products, services and accommodations" required for her "maximum feasible restoration/rehabilitation" pursuant to the No-Fault Act, including modifications to her parents' home, a modified van to allow for transportation, and 24 hour a day attendant care services.

Allstate initially denied Lisa's claim for basic loss benefits, and she responded by suing Allstate in the Court of Common Pleas of Allegheny County. Obusek v. Allstate Insurance Company, No. G.D. 79-27948 (C.P. Alleg. Cty. 1979).  That matter was not litigated, however, because a settlement was reached whereby Allstate agreed to pay a variety of benefits, including the cost of building an addition to the Obusek home.  Allstate also agreed to pay $40.20 per day for the 24 hour attendant care services provided by Mrs. Obusek and other family members.  Those payments were to continue for 18 months and the parties where then to be free to negotiate further payments.

When the 18 month period expired in August of 1982, Allstate agreed to continue paying at an increased *per diem* rate of $45.79. The original agreement was extended in all other respects for an additional two years, until August 25, 1984.  At the conclusion of that two year period, a third agreement was

7

negotiated wherein the *per diem* was increased to $125, or $45,625 per year, for a period of four years -- until August 25, 1988. The third agreement also provided that upon its expiration, the parties would each:

> have the right to request an increase or decrease in these payments. . . . should the parties be unable to reach such an agreement, each party will have the right to seek to resolve this issue through appropriate litigation pursuant to the Pennsylvania No-Fault Act.

Allstate also agreed to continue to pay the $125 per day, augmented annually by the increase in the consumer price index in the event of litigation.

In January of 1987, the Plan assigned Lisa's claim to Travelers, and Travelers began making the attendant care services payments. As of August, 1988, the insurance companies had paid more than $239,800 to the Obuseks for the services provided by Lisa's mother.

On August 28, 1988 (after the third agreement expired) Travelers filed a declaratory judgment action under 28 U.S.C. §2201 in the United States District Court for the Western District of Pennsylvania, seeking a determination of whether Travelers was obligated to pay Lisa for attendant care services provided in her home by her mother. Travelers asserted three reasons why it believed such services were not compensable.

First, Travelers contended that Mrs. Obusek's services were not compensable because she was not a licensed health care provider. Section 103 of the No-Fault Act, 40 Pa.C.S.A. §1009.103

8

stated that the insurer is "not obligated to provide basic loss benefits for allowable expense for medical and vocational rehabilitation services" if the providers of the services are not accredited by the Department of Health of the Commonwealth of Pennsylvania.

Second, Travelers contended that the services being provided by Lisa's mother were custodial only, and not rehabilitative. Section 103 also required that compensable rehabilitative services "reduce disability and. . . restore the . . . functioning of the victim."

Third, Travelers contended that the services were replacement services and that Lisa had already been paid the maximum allowable amount for replacement services under the No-Fault Act. Section 103 defines "replacement services" as "ordinary and necessary services in lieu of those the victim would have performed, not for income, but for the benefit of himself. . . if he had not been injured." The Act placed a cap on the amount of benefits payable for replacement services and that limit had been exceeded.

Lisa responded to Travelers' suit by filing a counterclaim in which she also requested declaratory relief. She asked the court to declare that:

> (1) TRAVELERS is obligated to pay LISA for attendant care provided by her family, pursuant to the terms of the AGREEMENT entered into between LISA and ALLSTATE on 10/9/84; and that
>
> (2) The daily attendant care payments are to be based upon the fair market value of such services; and that

(3) TRAVELERS is to provide LISA with all the products, services and accommodations required for LISA's maximum rehabilitation -- and as set forth in the prior AGREEMENTS between LISA, ALLSTATE and the PLAN, and as stated in the attached EIH evaluation, and as otherwise may be required;

(4) TRAVELERS is to pay LISA 18% penalty/delay interest as to all products, services and accommodations, or the fair value thereof, not provided by TRAVELERS -- pursuant to the Pennsylvania No-Fault Act;

(5) TRAVELERS is to pay LISA for counsel fees and costs incurred by LISA because of this litigation and because of TRAVELERS' failure to provide, of (sic) fully pay for, required products, services and accommodations.

Lisa also demanded four types of home improvements and approximately 30 pieces of equipment.

Travelers answered the counterclaim by admitting that it had not conducted a recent examination of Lisa and conceding that it therefore had no reports which refuted the recommendations contained in the EIH evaluation. However, Travelers did raise as a defense its contention that Lisa had never requested any of the products or services which the EIH evaluation recommended as necessary. Travelers therefore asserted that the issue of Lisa's entitlement to the services and accommodations recommended by EIH was not ripe for resolution. Additionally, Travelers contended that it had never been provided with a copy of the EIH evaluation until it was attached as an exhibit to the counterclaim.

After discovery was completed, the parties filed cross-motions for summary judgment. After some delay, the district

10

court assigned the case to a magistrate judge who issued her Report and Recommendation on May 11, 1993, recommending that Travelers' summary judgment motion be granted and Lisa's be denied. The magistrate judge based her recommendation on the fact that Lisa's mother was not a licensed health care provider. The magistrate judge reasoned that Travelers was therefore not obligated to pay for Mrs. Obusek's services under the No-Fault Act. Report and Recommendation at 7-8. However, the magistrate judge further concluded that Lisa's claims for home improvements and other equipment were not amenable to summary judgment. Id.

The district court adopted the Report and Recommendation over the Obuseks' objections and Travelers stopped making monthly payments. Thereafter, on January 7, 1994, at a status conference, the parties reached a settlement on all of the home improvement and equipment claims contained in Lisa's counterclaim. That settlement was eventually reduced to writing and approved by the district court.

During that status conference the parties debated whether any issues remained outstanding for the court to decide. Lisa's counsel contended that the district court only decided that Travelers has no obligation to pay for attendant care services provided by Lisa's mother but did not decide whether Travelers had any obligation to pay for attendant care services that may be provided by a licensed caregiver. Travelers disagreed and argued that the summary judgment in its favor had resolved all of the issues in the case.

11

Following briefing on this issue, the district court issued a Memorandum Opinion and Judgment Order dated October 14, 1994, in which it ruled that the issue of Travelers' obligation to pay for attendant care services, if provided by a licensed care-giver, was ripe for determination. The district court then granted summary judgment in Lisa's favor, and held that attendant care services, if "provided by accredited, non-family professional medical treatment and care providers" constitute "professional medical treatment and care" within the meaning of the No-Fault Act, and therefore, attendant care services are an "allowable expense" under the Act. Memorandum Opinion at 11. Travelers subsequent motion for reconsideration was denied, and this appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. Discussion

Travelers submits that the only person providing daily care services to Lisa is her mother, and that there is nothing in the record which shows that Lisa has any plans or intentions to hire anyone else to provide those services in the near future. Additionally, Travelers contends that no one ever asked that it pay for attendant care services provided by an accredited care-giver. Travelers suggests that it is therefore entirely "speculative whether anyone other than Mrs. Obusek will ever provide attendant care services to her daughter." Brief of Appellant at 19. Accordingly, Travelers argues that the issue of its obligation to pay for attendant care services provided by a licensed care-giver is not ripe for resolution.

12

## A. Ripeness

The Declaratory Judgment Act provides, in relevant part, as follows:

> § 2201. Creation of remedy
>
> (a) In a case of actual controversy within its jurisdiction,. . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Of course, Article III, Section 2 of the Constitution of the United States "limits federal jurisdiction to actual 'cases' and 'controversies.'" Armstrong World Industries, Inc. v. Adams, 961 F.2d 405, 410 (3d Cir. 1992). This constitutional provision "stands as a direct prohibition on the issuance of advisory opinions." Id. The existence of a "case or controversy" is a condition precedent to the proper exercise of judicial power by a federal court and the Declaratory Judgment Act can not relax that constitutional requirement. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950). As the Supreme Court explained in Maryland Casualty Co. v. Pacific Coal & Oil Co.:

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if not impossible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there

is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

312 U.S. 270, 273 (1941).  We have previously noted that:
[t]o satisfy Article III's case or controversy requirement, an action must present (1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution.

Armstrong World Industries, Inc. v. Adams, 961 F.2d 405, 411 (3rd. 1992) (internal quotation marks omitted).  As will be discussed in greater detail *infra*, as part of our inquiry into "ripeness", the instant controversy satisfies this requirement.

Federal jurisdiction is also limited by the doctrine of "ripeness".  "Ripeness" "determines when a proper party may bring an action."  Id.  The function of the ripeness doctrine is to prevent federal courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Abbott Lab. v. Gardner, 387 U.S. 136, 148 (1967).  While we have noted that there is some disagreement as to whether the ripeness doctrine is grounded in the case or controversy requirement or is more properly viewed as a "prudential limitation on federal jurisdiction," we recognize that the doctrine is at least partially grounded in the case or controversy requirement. Armstrong World Industries, Inc., 961 F.2d at 411 n. 12.

14

The parameters of "ripeness" are especially difficult to define within the context of declaratory judgment actions. Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 646 (3d Cir. 1990). This difficulty is due, in large measure, to the fact that declaratory judgments are, of necessity, rendered before an "accomplished" injury has been suffered. Id. at 647. Nonetheless, we have developed a method of analysis that focuses upon three factors to aid in determining if and when a declaratory judgment action is ripe. We examine the "adversity of the interest" between the parties to the action, the "conclusiveness" of the declaratory judgment and "the practical help, or utility" of the declaratory judgment. Id. If we are satisfied that all three elements are present, the declaratory judgment action is ripe.

### 1. Adversity of Interests

Parties' interests are adverse where harm will result if the declaratory judgment is not entered. Although the action cannot be based on a contingency, Id. at 647-648, the party seeking declaratory relief need not wait until the harm has actually occurred to bring the action. Armstrong World Industries, Inc. v. Adams, 961 F.2d at 412. Thus, in an appropriate circumstance, a litigant can seek a declaratory judgment where the harm is threatened in the future. However, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, "'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" Salvation Army v. Department of Community Affairs, 919 F.2d 183, 192 (3d Cir.

15

1990) (quoting <u>Steffel v. Thompson</u>, 415 U.S. 452, 460 (1974)). Accordingly, a party need not decide between attempting to meet the nearly insurmountable burden of establishing that the relevant injury is a mathematical certainty to occur, nor must a party await actual injury before filing suit. Erecting such barriers would eviscerate the Declaratory Judgment Act and render the relief it was intended to provide illusory. However, ripeness requires that the threat of future harm must remain "real and immediate" throughout the course of the litigation. <u>Id.</u> (quoting <u>Steffel v. Thompson</u>, 415 U.S. 459 n. 10).

Here, Travelers has taken the position that attendant care services are custodial in nature and that it therefore has no obligation under the No-Fault Act to pay for those services. Lisa, of course, contends otherwise. There is, therefore, a very real and immediate adversity of interests. This adversity is not negated merely because Travelers' own expert agrees that attendant care services are an absolute necessity, and that Lisa cannot do without them. That consideration is, however, relevant to the eventual resolution of the adversity of interests.

### 2. Conclusiveness

The declaratory judgment must also be conclusive. That is, the legal status of the parties must be changed or clarified by the declaration. <u>Step-Saver Data Systems, Inc. v. Wyse Technology</u>, 912 F.2d at 648. This portion of the analysis is part and parcel of the constitutionally mandated inquiry into the existence of a case or controversy. The "contest must be based on a 'real and substantial controversy admitting of specific

16

relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" Id. at 649 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937)).  An integral part of the conclusiveness inquiry is the necessity that the court be presented with a set of facts from which it can make findings.  Without a concrete set of facts, the court cannot engage in its required fact-finding role and declare the parties' rights based on those facts.  Without the necessary facts, the court is left to render an advisory opinion.  Id.; Armstrong World Industries, Inc., F.2d at 412.

Nonetheless, there are situations where the need for complete factual development is not absolutely essential.  For instance, where the question presented is "predominately legal", such as a question of federal preemption, a factual record is not as crucial as in a case where the question is whether there has been an unconstitutional taking of private property.  Armstrong World Industries, Inc., at 412.  There are also situations where a declaratory judgment can be issued absent proof of a necessary fact.  For example, if a future event is "certain to occur, such as enforcement of an existing statute or the death of a life-tenant or the future expiration of a contract, franchise or lease", a judgment declaring rights is appropriate."  Step-Saver Data Systems, Inc., 912 F.2d at 649 n. 7 (quoting EDWIN BORCHARD, DECLARATORY JUDGMENTS at 37-38 (2d Ed. 1941).

The conclusiveness of resolution of the instant controversy is closely related to the utility of resolving it.  A declaration

17

will conclusively establish Lisa's right to receive payment for attendant care if that care is given by an appropriate health care professional.  Lisa ought not to have to risk incurring the financial obligation of such care before knowing if Travelers is obligated to pay for it, and the question is primarily a legal one involving interpretation of the applicable legislation.

### 3. Utility

Finally, the declaratory judgment must have utility.  It must be of some practical help to the parties.  The Declaratory Judgments Act was enacted "to clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future."  Step-Saver, at 650.

> The idea behind the Act was to clarify legal relationships so that [parties] cold make responsible decisions about the future.  As Congressman Gilbert remarked in debate, '[u]nder the present [pre-Declaratory Judgment Act] law, you take a step in the dark and then turn on the light to see if you have stepped in a hole.  Under the declaratory judgment law you turn on the light and then take the step.'

Id. at 649-50.

Contrary to Travelers' suggestion, we think that the record, at least implicitly, reflects that, if her mother's services are not compensable, Lisa Obusek wishes to employ the a licensed health care giver to provide the attendant care services that she needs.  She need to know whether attendant care services are an allowable expense under the No-Fault Act if they are administered by a licensed health care professional.  She should not have to blindly take the step of incurring an expense that Travelers may

18

be legally obligated to assume before being told if she has stepped in a hole.

## B. Plaintiff's Prior Requests For Attendant Care.

We do not agree with Travelers' contention that Lisa has never asked Travelers to pay for attendant care services provided by non-family, accredited care givers. The EIH Health Care Evaluation was attached to her counterclaim and, as recited above, the Evaluation recommended attendant care services. The counterclaim specifically requested that the court declare that "TRAVELERS is to provide LISA with all the products, services and accommodations required for LISA's maximum rehabilitation -- as set forth in the prior AGREEMENTS between LISA, ALLSTATE and the PLAN, and as stated in the attached EIH evaluation, and as otherwise may be required;. . ." (emphasis added).

We find that the above-quoted prayer for relief in the counterclaim and the EIH Evaluation attached to the counterclaim is a clear and unequivocal demand for attendant care services under the No-Fault Act.

Finally, it is obvious that a declaratory judgment here will be of practical help to the parties. When the question of Travelers' obligation to pay for attendant care services provided by an accredited care-giver is finally resolved, Lisa and her family can make decisions about the future and Travelers will know the extent of its liability.

Accordingly, the issue of Travelers' obligation under the No-Fault Act to pay for attendant care services provided by an accredited care-giver is ripe for resolution.

19

## C. Allowable Expenses

The No-Fault Act allowed persons injured in automobile accidents to recover "allowable expense[s]."  The Act defined such expenses in relevant part, as follows:

> "Allowable expense" means reasonable charges incurred for, or the reasonable value of (where no charges are incurred), reasonably needed and used products, services and accommodations for:
>
> (A) professional medical treatment and care;
>
> (B) emergency health services;
>
> (C) medical and vocational rehabilitation services;
>
> (D) expenses directly related to the funeral, burial, cremation, or other form of disposition of the remains of a deceased victim, not to exceed one thousand five hundred ($1,500) dollars;. . .

40 Pa.C.S.A. § 1009.103 (repealed).  The parties agree that the attendant care in dispute here does not fall under the category of "emergency health services."[0]  Lisa does contend, however, that her attendant care needs do fit within the definition of "professional medical treatment and care" and "medical rehabilitation services."[0]

---

[0] "Emergency health services" refer to emergency services administered by emergency medical personnel. Id.

[0] Although Lisa is arguing that her attendant care requirements are medical rehabilitation services, we note that to the extent that attendant care would not reduce Lisa's disability or restore her functioning, the cost for those services would not be recoverable as "medical and vocational rehabilitation services" under the No-Fault Act.  Reilly v. SEPTA, 489 A.2d 1291 (Pa. 1985).  Whether or not attendant care services which would tend to reduce disability or to restore functioning are recoverable

The district court concluded that the Pennsylvania Supreme Court's decision in <u>Drake v. Pennsylvania National Mutual Casualty Ins. Co.</u>, 601 A.2d 797 (Pa. 1992), controlled its analysis. The court held that, under <u>Drake</u>, attendant care "provided by accredited non-family, professional medical treatment and care providers" is an allowable expense under Section 103 of the Act, Memorandum Opinion at 11, and therefore granted summary judgment to Lisa on her attendant care claim.[0]

Travelers argues that <u>Drake</u> is not controlling; that attendant care services are not an allowable expense under the Act even if provided by accredited care-givers; and that it therefore has no obligation to pay for such services. In <u>Drake</u>, Millard Fertig suffered serious spinal injuries when the automobile he was driving was struck from behind by another car. As a result of the injuries, Fertig was rendered quadriplegic. He received in-patient hospital care for approximately two months and then was released to his home with special equipment and nursing care. However, within a year of the accident, he was admitted to a nursing home where he remained until his death approximately 5 years later.

Fertig's automobile was covered by insurance under the No-Fault Act and his carrier paid all of the costs of his medical treatments. However, approximately three years before his death,

---

under the Act as "medical and vocational rehabilitation services" appears to be an open question under Pennsylvania law and is a question which we do not decide today.

[0]We exercise plenary review over the district court's grant of summary judgment. <u>Nathanson v. Medical College of Pennsylvania</u>, 926 F.2d 1368, 1380 (3d Cir. 1991).

the carrier filed a state-court declaratory judgment action to determine its obligation to pay for Fertig's room charges in the nursing home under the No-Fault Act.  The carrier argued that it was not liable for the room charges because Fertig "was receiving only custodial care at the home rather than medical or rehabilitative treatment."  Drake, 601 A.2d 797, 798-799.

At trial, the carrier presented medical testimony that Fertig had reached the point in his rehabilitation where he was no longer a candidate for physical therapy "and was receiving only maintenance and supportive care."  Id. at 799. However, one physician testified that Fertig needed periodic review of his bladder and bowel functions, that he required skilled nursing care or his condition could regress, and that even though he was not a candidate for rehabilitation he needed medical and nursing care because of his condition.  Id.

The trial court found that Fertig's medical condition required the care he was receiving at the nursing home and that Fertig's no-fault carrier had to pay that cost under the Act. Accordingly, the trial court ordered the carrier to pay for all of Fertig's charges at the nursing home including that portion of the charges that resulted from only custodial care.

On appeal, the Pennsylvania Superior Court reversed, holding that under Reilly v. SEPTA, 489 A.2d 1291 (Pa. 1985), no-fault carriers have no obligation to pay for expenses that are merely custodial.  See Pennsylvania National Mutual Casualty Ins. Co. v. Fertig, 555 A.2d 208 (Pa. Super. 1989).  In so deciding, the Superior Court quoted Reilly stating:  "[s]ervices which do not

22

reduce the disability of the victim or restore his functioning, being custodial in nature, would not be recoverable under the No-Fault Act. . . ." 555 A.2d at 209, (*quoting* Reilly, 489 A.2d at 1303). The Pennsylvania Supreme Court then granted allocatur:

> [t]o consider whether such custodial care might be 'medical care' payable by the insurer as an allowable expense under 40 P.S. § 1009.103 even though Reilly held that it was not the responsibility of the insurer because it was not "rehabilitation" under §103.

601 A.2d at 799.

The Pennsylvania Supreme Court ruled that the Superior Court's reliance on Reilly had been misplaced and reversed. 601 A.2d at 800. The court reasoned that Reilly only held that custodial care that was not rehabilitative was not recoverable as "medical and vocational rehabilitation services." However, "[i]t was never suggested that custodial, non-rehabilitative care might nonetheless be 'medical care' recoverable from a no-fault carrier as another type of allowable expense, namely 'professional medical treatment and care.'" Id.

The Court noted that the purpose of the No-Fault Act was to provide prompt and adequate basic loss benefits to victims of motor vehicle accidents and to guarantee that accident victims receive prompt and comprehensive professional treatment. Id. The court also noted that under Pennsylvania's Statutory Construction Act, 1 Pa.C.S.A. § 1928(c), the No-Fault Act "must be liberally construed to effectuate its purposes, **erring in favor of coverage**

23

**for the insured in close or doubtful cases**." Id. (emphasis added).

The court ruled that Fertig's nursing home accommodations would be covered under the No-Fault Act if the accommodations were necessary either as "professional medical treatment and care" or "medical and vocational rehabilitation services." The court concluded that if the cost of Fertig's nursing home accommodations was an allowable expense, then the room charges, i.e., custodial care charges, were covered as well. Id. at 801. Although Reilly precluded no-fault coverage for non-rehabilitative custodial care, the court determined "that entitlement for the cost of 'professional medical treatment and care' may include medically necessary nursing services even if the services may be characterized as custodial." Id. Thus, Fertig's nursing home accommodations were payable by his no-fault carrier as "professional medical treatment and care," and constituted an allowable expense under the Act even if some of the services included in those charges were custodial in nature as long as the custodial services were "necessary due to accident-related injuries." Id.

The analysis in Drake was based, in part, on language contained in Fertig's no-fault policy with the carrier. That policy covered reasonable charges incurred for "professional medical treatment and care" which included "hospital and professional nursing services for diagnosis, care, and recovery. . . ." Id. Here, there is no insurance policy because Lisa's claim was processed under the Assigned Claims Plan. Nonetheless,

24

we do not believe that the absence of a policy which defines "professional medical treatment and care" is crucial to the resolution of this case. The Drake court noted that the No-Fault Act does not define "professional medical treatment and care". Additionally, the court noted that neither the No-Fault Act nor 31 Pa. Code § 66.102 (which sets forth a sample No-Fault insurance policy) excludes custodial care from the definition of "professional medical treatment and care." Drake at 801.

Under Drake, custodial services that are administered as part of professional medical treatment and care are an allowable expense under the No-Fault Act so long as they are required because of accident-related injuries. See also, American Motorists Insurance Co. v. Farmers Bank and Trust Co. of Hanover, 644 A.2d 1232 (Pa. Super. 1994).

In Farmers Bank and Trust Co., American Motorists, the no-fault carrier, filed a petition for declaratory judgment seeking to be relieved of its obligation to pay for nursing home services which it characterized as "custodial care". Id. at 1233. Farmers Bank, the guardian of the estate of the person injured in the automobile accident, filed an answer and then moved for judgment on the pleadings, alleging that it was entitled to judgment as a matter of law because the no-fault carrier failed to raise the issue of whether the nursing home care was related to the accident. The trial court granted the motion for judgment on the pleadings and the no-fault carrier appealed.

A panel of the Pennsylvania Superior Court affirmed the trial court's grant of the motion for judgment on the pleadings.[0] In reaching that decision, the court commented as follows:

> In <u>Drake v. Pennsylvania Nat. Mut. Cas. Ins. Co.,</u>. . ., our supreme court held that, under the No-Fault Act, there is no per se exclusion for expenses related to medical and nursing care which is custodial; and that the cost of custodial care was an allowable expense under the applicable no-fault automobile policy under the No-Fault Act, so long as it was necessary due to accident related injuries.  Thus, the fact that the insured is receiving custodial care does not, of itself, relieve the insurer of the responsibility of the cost of his care. Rather, the insurer must, in terms of a motion for judgment on the pleadings, allege not only that the care is custodial, but also that the care in unrelated to the accident, in order to be relieved of the financial responsibility for the costs of this type of care.

644 A.2d at 1235 (citations omitted).  Accord, <u>Gallagher v. Harleysville Mutual Insurance Co.</u>, 617 A.2d 790, (Pa. Super., 1992) ("custodial services are compensable under § 1009.103 as an allowable expense of a professional medical treatment or care.")

Travelers is arguing that custodial care in the form of attendant care is not compensable under the Act even if administered by accredited health care professionals.

---

[0]Although the Superior Court affirmed the trial court's grant of the motion for judgment on the pleadings in regard to the carrier's failure to plead that the care was unrelated to the accident, the Superior Court reversed the trial court on the trial court's finding that the four year statute of limitations for declaratory judgment actions barred the no-fault carrier from amending its complaint.  644 A.2d at 1235.

26

It is beyond dispute that if Lisa were institutionalized in a rehabilitation center or nursing home Travelers would be obligated to pay the cost of custodial care that she received. See Drake, supra. Travelers' argument here is merely a restatement of the position that the Pennsylvania Supreme Court ruled against in Drake. The only distinction we perceive between Drake and its progeny on the one hand, and Lisa's claim on the other hand, is that Lisa has chosen to remain at home rather than be institutionalized. That choice cannot defeat her claim for No-Fault benefits. She needs attendant care because of her accident-related injuries, and Travelers cannot argue otherwise. Travelers' own expert opined that Lisa should have a licensed practical nurse available to her to change her Foley catheter and to supervise the attendant care "so that it is done effectively or any time she runs into respiratory, skin, autonomic, or GU complications." Joint Appendix at 473a. In addition to nursing supervision of her general attendant care, Lisa needs review of her bowel functions, including periodic artificial stimulation. This attention to bowel and bladder functions is similar to the kind of care Fertig was receiving in the nursing home in Drake and is, we believe, the kind of care that led the Pennsylvania Supreme Court to find that Fertig's nursing home accommodations were "professional medical treatment and care."

A contrary conclusion would mean that Lisa can only receive the attendant services she needs if she is taken from her own home and placed in a professional care facility such as a nursing home. Yet, such a result would not benefit either party to this

27

dispute.  It would add to Travelers' costs, and relegate Lisa to an institution.  Accordingly, we find that the attendant care services needed by Lisa are an allowable expense under Section 103(A) of the No-Fault Act.[ ]

Nevertheless, after a careful review of the record, we are concerned that the district court did not adequately address the exact nature and type of attendant care services Lisa requires. It appears that the district court assumed that Lisa would need the attendant care services outlined in the EIH Evaluation, however the court never made a finding to that effect. See Memorandum Opinion at 5 n. 3.[ ]  It is, of course, entirely possible that the district court intended that the "attendant care services" at issue are those set forth in the comprehensive and detailed EIH recommendation attached to the counterclaim and a formal finding to that effect may, therefore, be all that is necessary. In its order dated October 14, 1994, the court simply declared that Lisa was entitled to payment for all "'allowable expenses' under the Pennsylvania No-Fault Motor Vehicle Insurance Act . . . and [Drake]."  However, declaring that Travelers is liable for all payments required by law does not provide either side to this dispute the clarification the parties are entitled

---

[ ]Because we hold that attendant care services are an allowable expense under Section 103(A) of the No-Fault Act, it is unnecessary to consider Travelers' argument that the attendant care services are "replacement services" and therefore subject to the statutory limit for payment for replacement services that has already been met.

[ ]Travelers apparently assumed for purposes of this appeal that the attendant care services needed by Ms. Obusek are the same services that her mother has been providing to her since 1980.  Brief of Appellant at 22 n. 10.

28

to.  Accordingly, we will remand for a determination of the nature and type of attendant care services which are appropriate for Lisa's needs.  If the district court concludes that those services are sufficiently set forth in the EIH report it may, of course, make a finding of fact to that effect.

## IV.

For the above reasons, we will reverse the district court's judgment and remand for a determination of the nature and type of attendant care services required by Lisa.